GLASGOW SHIPOWNERS' CO., Limited, v. BACON.

(Circuit Court of Appeals, Second Circuit. June 9, 1905.)

No. 228.

**1. SHIPPING—CHARTER HIRE—FOUL BOTTOM RETARDING SPEED.**

The charterer of a vessel by a time charter is not entitled to a deduction from the charter hire because the vessel, owing to the foulness of her hull, failed to make the time he expected or that was made on a previous voyage, where he accepted her with knowledge that she had not been in dry dock for several months, during which time she had been employed in tropical waters, without any warranty as to speed, and where the clause in the printed charter for docking and cleaning was stricken out.

[Ed. Note.—For cases in point, see vol. 44, Cent. Dig. Shipping, §§ 156–164, 449, 450.]

**2. SAME—EVIDENCE OF DAMAGES.**

To entitle a time charterer to recover damages because of the slow speed made by the vessel on the voyage, on the ground that it was due to the foul condition of her bottom, there must be evidence to show with some definiteness how much of the loss of speed was due to such cause, rather than to others which may have lengthened the voyage.

Appeal from the District Court of the United States for the Southern District of New York.

On appeal from decree entered by the District Court for the Southern District of New York in favor of the libelant for $1,449.95, the amount, with interest and costs, found to be due the owners of the steamship Nile on a time charter party to the respondent. The opinion below is reported in 132 Fed. 881.

Charles S. Haight and John W. Griffin, for appellant.

J. Parker Kirlin and Charles R. Hickox, for appellee.

Before LACOMBE, TOWNSEND, and COXE, Circuit Judges.

PER CURIAM. This action is to recover the balance due on a charter party. The defense is that the owner did not deliver the vessel in the condition required by the charter. It is alleged that her bottom was exceedingly foul, and that this condition greatly reduced her speed, and required the consumption of additional coal. The appellant insists that the loss thus occasioned, which he computes at $1,262.99, and which he has withheld, should be deducted from the amount stipulated in the charter.

The question is a narrow one, and is fully discussed, and, we think, correctly decided, by the district judge. The decision should be affirmed, for reasons which may be stated as follows:

First. The charter contained no guaranty of speed. If the charterer had insisted upon a fixed speed, it is a fair inference that the owners would have required a larger sum for the use of their vessel than £600 per month. They, at least, knew that the steamer had

not been in a dry dock for nine months, and yet the attempt is made to construe the agreement as if they had expressly obligated themselves that the steamer should maintain the same rate of speed made on a previous voyage under differing conditions and immediately after coming off the dry dock. If the charterer deemed a speed guaranty essential, he should have insisted on it and paid for it. It is enough that he did neither.

Second. The steamer was stanch, strong, and seaworthy in every particular. This is not denied, unless the accumulation of grass, shells, and barnacles on her bottom rendered her unseaworthy. Undoubtedly her bottom was foul, but this condition has been very much exaggerated; there were no six-inch barnacles formed there. The master of the Nile saw her on the dry dock at Shields after she had made the additional voyage under the charter in controversy, and he says that the "very largest" barnacle would not extend more than an inch, or an inch and a quarter, from the hull of the ship. The exact condition of the ship's bottom when she was accepted by the charterer is not known. That it was to some extent foul and dirty, and that this condition would tend to lessen her speed, is known, but this is all. Nothing has been proved which amounts to a breach of the agreement to deliver a steamer "tight, staunch, strong and in every way fitted for the service," and "maintain her in a thoroughly efficient state in hull and machinery." A ship may be all this and still, after returning from a voyage to tropical waters, may have grass and shells on her bottom.

Third. The charter is dated July 2, and the steamer was delivered under it July 24, 1903. At the time of the delivery the appellant knew all the facts regarding the condition of the Nile that were known to her master, for the latter informed him, saying that "he expected he would not be apt to make his usual speed as he had before, unless the ship would dock." The owners declined to dock her, and yet appellant accepted her. Before he signed the charter he was aware of facts which should have put him on his inquiry as to the ship's condition. There had been a previous charter of the Nile to appellant, which expired May 28, 1903. She was then immediately chartered to Thibeaud Bros., and on her return she was taken under the present charter. Under both of these charters she had been trading in southern waters—Cuba, Mexico, and the West Indies. She had not been in a dry dock during all this period, and the appellant knew it. If he did not know that such long cruising in tropical waters would produce the condition of which he now complains, he should have known it. The appellant's brief, referring to the steamer, says:

"She had therefore been employed in tropical waters for eight or nine months prior to the charter in suit without docking—a period sufficient to render it certain that she must be foul."

Fourth. The provision in the printed form for docking and cleaning the steamer was deleted. It is said that this is customary where the charter is for one voyage only, but, however this may be, the

striking out of this clause must have called the attention of the appellant sharply to the subject, especially in view of the fact that in his previous charter the clause was retained. Is it not apparent that he made the agreement with full knowledge of the facts, and with no provision, express or implied, for the docking of the ship?

Fifth. The contention that the foul bottom of the steamer occasioned damages to the extent of the amount withheld is based largely on conjecture. Some of the loss of speed can no doubt be attributed to this cause, but how much? The appellant's brief concedes that the amount retained was incorrect by $324. If the loss of speed can be attributed, even in part, to other causes; if the speed made on previous voyages, under conditions essentially different, forms an inaccurate basis of comparison; if the proof as to what extent the steamer's bottom was covered with grass and barnacles be vague and uncertain—is it not plain that the claim for damages depends upon too many contingencies to be sustained?

The decree is affirmed, with interest and costs.